17IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| MARTONE CONSTRUCTION MANAGEMENT, INC. | : |
|  | : |
| v. | : Civil Action No. DKC 23-450 |
| THOMAS A. BARRETT, INC., d/b/a National Employers Retirement Trust, et al. | : |
|  | : |

**MEMORANDUM OPINION**

Martone Construction Management Inc., as Plan Administrator for the Martone Construction Management, Inc. Defined Benefit Benefit Pension Plan and the Martone Construction Management, Inc. 401(k) Profit Sharing Plan ("Martone"), filed a complaint pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq*, against Thomas F. Barrett, Inc. ("Barrett"), National Employers Retirement Trust ("NERT"), Sandy Spring Bank ("Sandy Spring"), and Acorn Financial Advisory Services ("Acorn"). Presently pending and ready for resolution are (1) a motion to dismiss filed by Sandy Spring; (2) a motion to dismiss filed by Barrett and NERT; and (3) a motion to dismiss filed by Acorn (collectively, "NERT Defendants"). (ECF Nos. 11, 16, 19). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motions will be granted in part and denied in part.

## I.   Background

The following facts are alleged in the complaint.  Martone, a commercial general contractor, created a 401(k) Plan in 2006 and a Defined Benefit Plan in 2009 ("the Plans") for its employees. It engaged Barrett and NERT to provide employee retirement plan administration services.  Barrett provided recordkeeping and administrative functions for the Plans.  Barrett and Sandy Spring were responsible for making trades with the investment funds of the Plans at the direction of Martone or 401(k) Plan participants. Barrett sent Martone periodic invoices listing the services provided and the amounts owed, which only included administration fees.

Martone alleges that on February 21, 2020, Thomas F. Barrett ("Mr. Barrett") at Barrett informed Martone that NERT Defendants had been charging investment fees to Martone since Martone engaged them, in the amount of 0.85% of the Plans' assets.  The investment fees, Martone asserts, had not been listed on any invoice, statement, or other document that Martone received from Barrett, Acorn, or Sandy Spring.

Martone demanded that Barrett refund the investment fees (estimated to total approximately $350,000 to $400,000).  In response, also on February 21, 2020, Mr. Barrett sent a document, dated July 15, 2019, captioned "408(b)2 Plan Sponsor Disclosure" ("the Disclosure").  Martone alleges upon information and belief

2

that NERT Defendants did not provide the Disclosure to Martone at any time before February 21, 2020.  It asserts that it has no record of receiving the Disclosure before that date.  The Disclosure included lists of services provided by Barrett, Sandy Spring, and Acorn, and fees related to each service.  Martone alleges that before receiving the Disclosure, it had no knowledge of any services provided by Acorn and had never received any communication from either Acorn or Sandy Spring.  Martone requested an accounting from Barrett of all fees since the Plan's inception, and Mr. Barrett responded that Barrett did not keep a record of such fees and transactions.

Martone alleges that NERT Defendants did not provide any investment advice to Martone or the Plans.  For instance, NERT Defendants did not inform Martone until February 2020 that they provide a self-directed Key Advisor account through TD Ameritrade, which would have allowed Martone the ability to control its own trades and provided additional access to Acorn's services.  When Martone asked to register for this account, Barrett allegedly ignored its requests.

Martone asserts that Barrett failed to communicate in a timely manner, failed to communicate the availability of investment options, and ignored many of Martone's requests regarding timing of trades.  For instance, on February 28, 2020, Martone instructed Barrett to trade certain investment funds.  When Barrett had still

3

not replied a week later, on March 6, 2020, Martone directed Barrett to "[p]lease get me out today."   When Barrett had not replied three days later on March 9, 2020, Martone again requested the trade.   Barrett told Martone that NERT Defendants only conduct trades on Wednesdays.   The Disclosure provides that Sandy Spring will make investments as directed by the Plan and will "[v]erify and settle nightly NSCC trades by the following business day." Martone asserts that based upon the failure of NERT Defendants to execute the requested trades, NERT's website showed a loss of almost $800,000 on March 15, 2020.

In April 2020, July 2020, and December 2020, as well as on three occasions in December 2022-January 2023, Martone requested that NERT Defendants transfer the Defined Benefit Plan funds to another service provider (first Benetech Inc. ("Benetech") and later Charles Schwab Corporation ("Schwab")).   On April 29, 2020, July 31, 2020, and January 9, 2023, Barrett informed Martone that it denied the request to transfer the assets because the Defined Benefit Plan and the 401(k) plan were "paired" or "dual"—meaning Martone could not transfer the Defined Benefit Plan without also transferring the 401(k) funds and completing a 30-day blackout notice.   Martone alleges that it requested a blackout notice between August 2020 and December 1, 2020.   Martone asserts that the Plan documents do not reference a pairing of the Plans and that each Plan filed separate Form 5500s every year.   On January

10, 2023, Martone asked Barrett to justify why it had not made the transfer, and Barrett did not respond.

On February 3, 2023, Martone's counsel sent Barrett a letter demanding that NERT Defendants transfer the assets of the Defined Benefit Plan to Schwab, provide a copy of any contract between Martone and NERT Defendants, provide an accounting of all fees paid by Martone or the Plans to NERT Defendants, and refund all investment fees paid by Martone to NERT Defendants.

On February 7, 2023, Barrett informed Martone that the "transfer of plans assets are being processed."  That same day, Martone's counsel reiterated that Martone had only authorized the transfer of the Defined Benefit Plan assets.  On February 8, 2023, Barrett informed Martone that the Defined Benefit Plan assets had been wired to Schwab.  On February 9, 2023, without a blackout notice and allegedly without authorization, NERT Defendants sent a check made payable to "Larry Martone, Trustee, Martone Construction Management, Inc. 401(k) PS Plan" and a letter to Benetech stating that Barrett determined it could no longer serve as custodian of the 401(k) Plan.  On February 10, 2023, Martone's counsel requested an accounting of fees and refund of investment fees, which Barrett did not provide.  (ECF No. 1 ¶¶ 15-72).

Martone brings claims for (1) breach of fiduciary duty under ERISA, 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109; (2) equitable

relief under ERISA, 29 U.S.C. § 1132(a)(3); (3) common law breach of fiduciary duty; (4) unjust enrichment; and (5) negligence.

## II.  Standard of Review

A 12(b)(6) motion tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). "[T]he district court must accept as true all well-pleaded allegations and draw all reasonable factual inferences in plaintiff's favor." *Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021). A plaintiff's complaint need only satisfy the standard of Fed.R.Civ.P. 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" A Rule 8(a)(2) "showing" still requires more than "a blanket assertion[ ] of entitlement to relief," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007), or "a formulaic recitation of the elements of a cause of action[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 545). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Mays*, 992 F.3d at 299-300 (quoting *Iqbal*, 556 U.S. at 663).

## III. Analysis

### A. ERISA Fiduciary Claims

Section 409(a) of ERISA imposes liability for breach of fiduciary duty:

6

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).  Accordingly, to state a claim for breach of fiduciary duty under ERISA, plaintiffs must allege "1) that a defendant was a fiduciary of the ERISA plan, 2) that a defendant breached its fiduciary responsibilities under the plan, and 3) that the participant is in need of injunctive or other appropriate equitable relief to remedy the violation or enforce the plan." *Mahoney v. iProcess Online, Inc.*, No. 22-cv-0127-JKB, 2022 WL 17585160, at *3 (D.Md. Dec. 12, 2022) (citing *Adams v. Brink's Co.*, 261 F.App'x. 583, 589-90 (4th Cir. 2008)).  "[T]he threshold question is whether the plaintiff has sufficiently alleged that the defendant was a 'fiduciary.'"  *Moon v. BWX Techs., Inc.*, 577 F.App'x 224, 229 (4th Cir. 2014) (quoting *Coleman v. Nationwide Life Ins. Co.,* 969 F.2d 54, 60-61 (4th Cir. 1992)).

"ERISA . . . defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993). "ERISA contemplates two general types of fiduciaries.  The first

type is a 'named fiduciary,' which — as the term suggests — is 'a fiduciary who is named' in the plan documents." *Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d 269, 275 (4th Cir. 2019) (internal citations omitted).  The second type is a functional fiduciary, which is an individual or entity that "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets."  *Id.* at 276 (citing 29 U.S.C. § 1002(21)(A)).  "Accordingly, a party need not be listed in a plan instrument to owe fiduciary duties in the plan's administration." *Acosta v. WH Admins., Inc.*, 449 F.Supp.3d 506, 516 (D.Md. 2020).  Rather, "[t]he concept of a fiduciary under ERISA . . . includes . . . any individual who *de facto* performs specified discretionary functions with respect to the management, assets, or administration of a plan." *Custer v. Sweeney*, 89 F.3d 1156, 1161 (4th Cir. 1996) (internal citations and quotation marks omitted).

"Under ERISA's functional fiduciary standard, 'being a fiduciary under ERISA is not an all-or-nothing situation.'" *Peters v. Aetna Inc.*, 2 F.4th 199, 228 (4th Cir. 2021), *cert. denied sub nom. OptumHealth Care Sols. v. Peters*, 142 S.Ct. 1227 (2022) (quoting *Gordon v. CIGNA Corp.*, 890 F.3d 463, 474 (4th Cir. 2018)). Instead, courts "must ask whether a person is a fiduciary with respect to the particular activity at issue." *Coleman*, 969 F.2d

at 61. "The definition of fiduciary is limited *to the extent* a person exercises discretion." *NARDA, Inc. v. Rhode Island Hosp. Tr. Nat. Bank*, 744 F.Supp. 685, 690 (D.Md. 1990).

The United States Court of Appeals for the Fourth Circuit has "consistently utilized an interpretive bulletin published by the Department of Labor" to assess "whether a person or entity qualifies as a fiduciary under ERISA." *Dawson-Murdock*, 931 F.3d at 276 (citing 29 C.F.R. § 2509.75-8; *Sweeney*, 89 F.3d at 1162; *Coleman*, 969 F.2d at 61-62). "The bulletin emphasizes that '[s]ome offices or positions of an employee benefit plan by their very nature require persons who hold them to perform one or more [of the] functions' described in ERISA's definition of a 'fiduciary,'" such as a "plan administrator." *Id.* at 276 (citing 29 C.F.R. § 2509.75-8 (D-3)). In contrast, the bulletin also

> suggests that "a person who performs purely ministerial functions . . . within a framework of policies, interpretations, rules, practices and procedures made by other persons," such as applying "rules determining eligibility for participation or benefits," "advising participants of their rights and options under the plan," and collecting "contributions . . . as provided in the plan," is not acting in a fiduciary capacity.

*Id.* (citing 29 C.F.R. § 2509.75-8 (D-2)).

Martone alleges that NERT Defendants were fiduciaries of the Plans, that they breached their fiduciary duties, and that the

breach resulted in losses to the Plans.  Specifically, Martone alleges:

> Each of the NERT Defendants was a fiduciary with respect to the Plans under ERISA. [Acorn] purportedly rendered investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of the Plans. [Sandy Spring] was a fiduciary because it was a trustee. [Barrett] was also a fiduciary because it exercised discretionary authority or control respecting management of the Plans and the administration of the Plans, and it exercised authority or control respecting management or disposition over Plan assets, as evidenced by [Barrett] deducting fees from the Plans' assets.

(ECF No. 1 ¶ 75) (internal citations omitted).  Martone next alleges that NERT Defendants breached their fiduciary duties:

- Barrett and Sandy Spring "failed to follow Martone's instructions with respect to Plan assets, including with respect to rebalancing the Plans' assets and making trades as instructed by Martone in a timely manner, resulting in market losses;"
- Barrett and Sandy Spring "failed to make trades within one business day, as set forth in NERT Defendants' own document and in accordance with a reasonable standard of care, resulting in market losses;"
- Barrett and Sandy Spring "failed to transfer the Defined Benefit Plan assets to Schwab as requested, and retain[ed] those assets from the time of Martone's original transfer request until February 8, 2023;"
- "NERT Defendants charged investment fees to the Plans, when no investment advisory services or other services were provided beyond those that appeared on [Barrett's] invoices and such fees were not timely and properly disclosed as required by 29 CFR § 2550.408b-2, and Martone reasonably

believed that the only fees the Plans paid
were those that appeared on the invoices
sent by [Barrett], and the NERT Defendants
did not display any investment fees on any
of the Plans' statements;"

- "Upon information and belief, NERT
  Defendants continued to charge investment
  fees from the time that Martone requested
  that NERT Defendants transfer the Defined
  Benefit Plan funds until the time the funds
  were actually transferred, almost three
  years later;"

- Acorn "did not provide any investment
  advice to Martone, the Plan, or Plan
  participants, despite apparently receiving
  investment advisory fees for such
  services;"

- "NERT Defendants failed to facilitate,
  communicate, or allow Martone and the Plan
  to fully invest in and participate in the
  market, such as through having a self-
  directed Key Advisor account through TD
  Ameritrade, which would have allowed
  Martone to select from a wider selection of
  investments and allowed Martone to trade at
  any time (while NERT Defendants purported
  to make trades only on Wednesdays) and would
  have provided additional access to [Acorn]
  – despite having charged the Plans a fee
  that should purportedly have included this
  and other services;"

- Barrett and Sandy Spring "liquidated and
  transferred the 401(k) Plan Assets, which
  was not authorized by Martone and contrary
  to Martone's instructions;" and

- Barrett "failed to timely communicate with
  Martone or respond to Martone's
  communications and follow Martone's
  instructions."

(ECF No. 1 ¶ 78). Finally, Martone alleges that NERT Defendants'

conduct resulted in losses:

> As a result of the NERT Defendants' actions
> and breaches, Plaintiff and the Plans have

11

> incurred losses, including but not limited to
> the decrease in value of Plan assets and
> improper payments out of Plan assets,
> resulting in a loss to the Plans and causing
> injury to participants and beneficiaries.

(ECF No. 1 ¶ 80).  Consequently, Martone requests (1) orders
requiring Defendants to "make good to the Plans all losses
resulting from their breaches" and "restore to the Plans any
profits which have been made through use of Plan assets;" (2) "[a]n
accounting of, *inter alia*, all direct and indirect compensation
charged to Martone and/or the Plans, all transactions with respect
to Plan assets, and a valuation of investment funds that NERT did
not trade as instructed;" (3) "other equitable relief or remedial
relief as the Court may deem appropriate;" (4) "[a]ny other damages
or relief in an amount according to proof;" (4) "[a]n award of
punitive damages;" (5) "[p]re and post judgment interest, as
afforded by law;" (6) "reasonable attorneys' fees and costs;" and
(7) "[s]uch other equitable and legal relief as is appropriate."
(ECF No. 1, at 27-28).

### 1. ERISA Fiduciary Claim Against NERT

Barrett and NERT request that the court dismiss all counts
against NERT because as a trust, it is not a person or entity
capable of being sued.  (ECF No. 16-1, at 28).  Martone submits
that "[b]ased upon the representations by Barrett, NERT, and their
joint counsel that NERT is only a trust and is not a legal entity
or an employee benefit plan, Martone would not oppose the dismissal

of NERT as a separate defendant from this lawsuit." (ECF No. 25, at 28). Because "the trust estate is not a person in the eyes of the law and does not have the capacity to be sued as an entity," all counts against NERT will be dismissed. *Limouze v. M. M. & P. Mar. Advancement, Training, Ed. & Safety Program*, 397 F.Supp. 784, 789 (D.Md. 1975).

### 2. ERISA Fiduciary Claim Against Barrett

Conceding that Martone itself is the Plan's named fiduciary, Martone contends that Barrett is a functional fiduciary because it "exercised discretionary authority or control respecting management of the Plans and the administration of the Plans, and it exercised authority or control respecting management or disposition over Plan assets, as evidenced by NERT Administrator deducting fees from the Plans' assets." (ECF No. 1 ¶¶ 4, 75). Barrett maintains that it is not a functional fiduciary because it only "provided certain administrative services to the Plans" including "recordkeeping and executing investment orders at the direction of Martone or its employee participants"—essentially, that it provided only ministerial, not discretionary, functions. (ECF No. 16-1, at 18) (citing ECF No. 1 ¶¶ 9, 18, 19). Barrett argues that "[t]he one factual allegation concerning Barrett's fiduciary status is that Barrett deducted fees from the Plans' assets. Deducting a fee for services from plan assets pursuant to a previously established structure, however, is not a fiduciary

function." (*Id.* at 18) (citing ECF No. 1 ¶ 75; *McLemore v. Regions Bank*, 682 F.3d 414, 424 (6th Cir. 2012)) (internal citation omitted).  Martone responds that "Barrett's deduction of its fees from the Plans' assets is 'evidence[ ]' that Barrett exercised discretionary authority or control respecting management or administration of the Plan and authority or control respecting management or disposition over Plan assets." (ECF No. 25, at 14-15).  To support the proposition that Barrett acted as a fiduciary by deducting fees from the Plans' assets, Martone cites *Perez v. Chimes Dist. of Columbia, Inc.*, No. 15-cv-3315-RDB, 2016 WL 6124679, at *5 (D.Md. Oct. 20, 2016), where the court deemed the defendant a fiduciary because "Plan documents specifically grant[ed] [Defendant] control over making payments with Plan assets."

Barrett, however, argues that *Perez* "concerned an ERISA trustee who controlled plan money by exercising her judgment to write unauthorized checks on plan assets.  It does not concern the provision of administrative investing services, like investment order execution and providing access to a certain style of account." (ECF No. 30, at 15).  Barrett asserts that "[d]educting a fee for services from plan assets pursuant to a previously established structure . . . is not a fiduciary function." (ECF No. 16-1, at 18) (citing *McLemore*, 682 F.3d at 424).  Instead, Barrett contends, citing only out-of-circuit authorities, "[a]n

14

agent with an established commission rate is not, without other indicia, a fiduciary to the plan by deducting his commission from plan assets."   (ECF No. 16-1, at 18) (citing *United States v. Glick*, 142 F.3d 520, 528 (2ᵈ Cir. 1998); *United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F.Supp.3d 461, 470 (S.D.N.Y. 2014)).

"Fourth Circuit decisions strongly support the conclusion that [a] plaintiff[ ] must do more than quote the statutory language regarding 'discretionary control' to plead adequately that a given defendant is a *de facto* ERISA fiduciary." *In re Mut. Fund Inv. Litig.*, 403 F.Supp.2d 434, 446 (D.Md. 2005).  Here, while Martone's allegations are brief, the complaint does allege that Barrett acted as a fiduciary by deducting fees from the Plans' assets, thereby "exercis[ing] authority or control respecting management or disposition over Plan assets."   (ECF No. 1 ¶ 75). At this stage—in which the court must assume the truth of the factual allegations and construe them favorably to Martone—it suffices to state a facially plausible claim that Barrett acted as a fiduciary by deducting fees from the Plans' assets.  *See Boyd v. Coventry Health Care Inc.*, 828 F.Supp.2d 809, 818 (D.Md. 2011).

Barrett contends that its deduction of fees is not "fiduciary in nature" because it deducted "a fee for services from plan assets pursuant to a previously established structure" that was "established by agreement," and that Barrett is not a fiduciary

where it "fully and repeatedly disclosed the fee" and "Martone authorized the fee." (ECF No. 16-1, at 18-19). Martone, however, correctly asserts that the court cannot on a motion to dismiss consider the extrinsic documents Barrett provided to support its assertion that Martone had notice of the fees. (ECF No. 25, at 10-11) (citing *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015)). Barrett argues that the court can consider the extrinsic documents because "Martone not only references the [quarterly] statements, but it relies on them for the material contention that the statements contained no notice of the fee," and thus they are "integral to the Complaint." (ECF No. 30, at 6-7). As Martone points out, this court's reasoning in *Alston v. Citibank, N.A*, No. 14-cv-3199-DKC, 2015 WL 2227930 (D.Md. May 11, 2015) is relevant:

> Defendant asserts that the "[t]he notice of denial, or lack thereof, is clearly integral to the Complaint and relied upon by Plaintiff." This argument is misplaced. In the complaint, Plaintiff asserts that he did *not* receive any notice from Defendant denying his credit card application, which he submitted in February 2013. In other words, the ECOA claim relies on the *absence* of a letter, not its issuance, and whether or not Citibank indeed gave proper notice under ECOA creates a factual dispute inappropriate for resolution at the motion to dismiss stage.

*Alston*, 2015 WL 2227930, at *4 (internal citation omitted). Here, Martone similarly contends—upon information and belief—that Barrett did not provide notice of the fees until February 21, 2020.

16

Thus, the ERISA claim relies on the *absence* of a quarterly statement, not its issuance.    Martone also disputes the authenticity of the documents.  (ECF No. 25, at 12).  As in *Alston*, "the facts alleged in the complaint must be taken as true at this stage and the court cannot rely on documents whose authenticity Plaintiff challenges."  *Alston*, 2015 WL 2227930, at *4. Accordingly, Martone has plausibly alleged that Barrett was a fiduciary for the purposes of an ERISA action.

Martone has also adequately pled that Barrett breached its fiduciary duties.  In response to Martone's allegation that Barrett breached its duties by deducting a fee without providing notice, Barrett argues that (1) the fee was not an investment fee; (2) the allegation that Martone, upon information and belief, did not receive the Disclosure is insufficient to state a claim; and (3) the allegations that the Disclosure was addressed to all NERT participants and do not indicate which services are provided to which Plan sponsors do not state a claim.  (ECF No. 16-1, at 20-22).  Martone replies, first, that it "specifically alleges that on February 21, 2020, Mr. Thomas Barrett 'informed Mr. Martone that NERT Defendants had been charging investment fees.'"  (ECF No. 25, at 19).  Whether or not Mr. Barrett used the term "investment fees" is a factual dispute.  Assuming the truth of Martone's factual allegation, Martone has adequately pled that Barrett charged investment fees without providing investment

advisory services.  In response to Barrett's second point, Martone argues that it "affirmatively pled that [Mr. Martone] did not receive these documents, alleging: 'Martone has no record of receiving the Plan Sponsor Disclosure on July 15, 2019 or at any time prior to February 21, 2020.'" (*Id.* at 20).  Instead, Martone argues, "[t]he only thing [it] pled 'upon information and belief' was whether or not Barrett sent the documents[.]" (*Id.*) (internal citation omitted).  Barrett is correct that "Martone cannot establish nonreceipt by pleading it did not get [the Disclosures] 'upon information and belief.'" (ECF No. 16-1, at 21) (citing ECF No. 1 ¶ 30).  Plaintiffs, however, are "generally permitted to plead facts [upon information and belief] if the necessary evidence is controlled by the defendant." *Adobe Sys. Inc. v. Gardiner*, 300 F.Supp.3d 718, 728 n.5 (D.Md. 2018) (citing *Ridenour v. Multi-Color Corp.*, 147 F.Supp.3d 452, 456 (E.D. Va. 2015)).  Here, the question of whether Barrett sent the Disclosures constitutes evidence controlled by Barrett, so it is permissible to plead upon information and belief.  Martone does not plead upon information and belief that it "has no record of receiving the Plan Sponsor Disclosure on July 15, 2019 or at any time prior to February 21, 2020." (ECF No. 1 ¶ 30).  Thus, Martone has adequately pled that Barrett did not provide the Disclosure before February 21, 2020, and that it has no record of receiving the Disclosure before that date.  That Martone does not respond to Barrett's third point is

inconsequential because it has plausibly alleged that Barrett charged an investment fee without providing notice.

Martone has also adequately stated a claim that Barrett's failure to follow instructions with respect to investments constitutes a breach of fiduciary duty. Barrett argues that "the fiduciary duty of prudence does not apply to functions like carrying out instructions." (ECF No. 16-1, at 24). The duty of prudence, it contends, "traditionally arises in deciding which investment options to make available to the ERISA plan," and Barrett had only "administrative responsibility and authority to process Martone's securities buy-sell orders for the Plans." (*Id.* at 25). Martone responds that Barrett's "failure to follow Martone's instructions with respect to Plan assets is a 'fiduciary function'" and that Barrett breached that duty by failing to "follow[ ] the Plan administrator's instructions" and "failing to follow the reasonable standard of care, including failing to make trades every day and within one business day—especially at a time 'when the market was in volatile decline' and Martone expressed the urgency of his instructions to 'Please get me out today[.]'" (ECF No. 25, at 22). The *Perez* court found that the plaintiff had properly stated a claim for breach of fiduciary duty under ERISA by alleging that a defendant "fail[ed] to follow . . . proper directions." *Perez*, 2016 WL 6124679, at *4. Here, similarly, Martone has plausibly alleged that Barrett breached its fiduciary

duties by failing to follow Martone's instructions such as making trades, transferring funds, and transferring the funds of the 401(k) Plan contrary to instructions.

### 3. ERISA Fiduciary Claim Against Sandy Spring

In the complaint, Martone alleges that Sandy Spring was a fiduciary of the Plan.  First, it contends that Sandy Spring, together with Barrett, was "responsible for making trades with the investment funds of the Plans at the direction of Martone or 401(k) Plan participants."  (ECF No. 1 ¶ 19).  Second, it argues that Sandy Spring controlled payment of improperly charged investment fees.  (ECF No. 1-1, at 5 ("NERT Administrator receives an indirect asset-based fee . . . which is deducted by [Sandy Spring] from the assets of each of the Fund option that you designate to be investment alternatives offered under your Plan.")).  Third, it attaches a Disclosure to the complaint that states:  "[A]s Nondiscretionary Directed Trustee, [Sandy Spring] is a fiduciary to your Plan solely to the extent of its responsibilities as described in DOL Field Assistance Bulletin 2004-03."  (*Id.* at 2). The Bulletin, in turn, "specifically recognizes the fiduciary duty of a directed trustee under ERISA."  (ECF No. 20, at 7).

Sandy Spring asserts that it is not a fiduciary because it

> had no discretionary authority over the Plans'
> assets.  Indeed, [Sandy Spring] had no
> authority of any kind with respect to the
> Plans. [Sandy Spring] served as a "directed
> trustee" for NERT, not Martone.  In that

> capacity, [Sandy Spring] invested NERT's
> assets based upon instructions that [Sandy
> Spring] received from Barrett/NERT.  Not only
> did [Sandy Spring] have no discretion with
> respect to the instructions that it received
> from Barrett, but it also had no control over
> how NERT's assets were invested.

(ECF No. 11-1, at 12).  Sandy Spring adds that it "did not have any duties and responsibilities of an ERISA fiduciary as the Fourth Circuit has described them" in *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 417 (4th Cir. 2007); namely, that it was not responsible for "the proper management, administration and investment of plan assets, the maintenance of proper records, the disclosure of specific information, [or] the avoidance of conflicts of interest."  (ECF No. 11-1, at 13, 15).

Martone responds that directed trustees can be held liable as ERISA fiduciaries "where [they] fail[ ] to follow proper directions or compl[y] with directions that are improper, or contrary to the Plan or ERISA."  (ECF No. 20, at 11) (citing *Perez*, 2016 WL 6124679, at *4).  Martone's allegations raise factual disputes whether Sandy Spring had discretionary authority over the Plans' assets and whether it complied with improper instructions from Barrett.  Accordingly, Martone has plausibly alleged that Sandy Spring was a fiduciary for the purposes of an ERISA action.  Because Martone alleges Sandy Spring acted in concert with Barrett in many of Barrett's alleged breaches of fiduciary duty, it has also adequately alleged that Sandy Spring breached its fiduciary

duties under ERISA for the same reasons as those pertaining to Barrett (explained above).

### 4. ERISA Fiduciary Claim Against Acorn

Martone alleges that Acorn is a fiduciary because it "purportedly rendered investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of the Plans."  (ECF No. 1 ¶ 75).  Acorn argues that

> a plaintiff alleging that a defendant is a fiduciary because it rendered investment advice for a fee "must plead that (1) the defendant provided individualized investment advice; (2) on a regular basis; (3) pursuant to a mutual agreement, arrangement, or understanding that (4) the advice would serve as a primary basis for the plan's investment decisions; and (5) the advice was rendered for a fee.

(ECF No. 19-2, at 14) (citing *Walker v. Merrill Lynch & Co. Inc.*, 181 F.Supp.3d 223, 231 (S.D.N.Y. 2016)).  According to Acorn, Martone fails to "plead the elements necessary to support its *suspicion* that Acorn is a Plan fiduciary." (ECF No. 19-2, at 14).

It is undisputed that Acorn did not provide investment advice to the Plan.  ERISA, however, provides that an investment advisor is a fiduciary if it "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, *or has any authority or responsibility to do so*." 29 U.S.C. § 1002(21)(A)(ii) (emphasis added).  Martone

alleges that Acorn had the authority or responsibility to provide investment advice because the Disclosure provides that Acorn "is responsible for . . . recommending alternatives and executing Key Advisor brokerage instructions as directed by you and the Plan's participants[.]" (ECF No. 1-1, at 2). Consequently, Martone has adequately alleged that Acorn is a fiduciary.

It is also undisputed that Acorn only agreed to provide investment advice if the Plan enrolled in a Key Advisor program, and that the Plan had not enrolled. Martone, however, alleges that the NERT Defendants deprived Martone of the ability to enroll in the Key Advisor program by failing to notify Martone that it was available. (ECF No. 1 ¶ 27). Martone does not allege that Acorn knew Martone was not aware of the Key Advisor program. Nevertheless, it has adequately stated a claim that Acorn breached its fiduciary duties by alleging that Acorn received a fee in exchange for the authority to render investment advice.

**B. ERISA Co-Fiduciary Claims**

In paragraph 83 of the complaint, Martone alleges that

> each Defendant is liable for the breaches of
> each other Defendant as co-fiduciary, insofar
> as each knowingly participated in the acts or
> omissions of the other fiduciaries, knowing
> such acts or omissions were a breach; each
> Defendant, by failing to comply with
> § 1104(a)(1) in the administration of its
> specific responsibilities which give rise to
> its status of fiduciary, enabled such other
> fiduciaries to commit a breach; and/or each
> Defendant had knowledge of the breach by such

> other fiduciaries and did not make reasonable
> efforts to remedy the breach.

(ECF No. 1, at 18).  ERISA provides:

> [A] fiduciary with respect to a plan shall be
> liable for a breach of fiduciary
> responsibility of another fiduciary . . . if
> he participates knowingly in, or, knowingly
> undertakes to conceal, an act or omission of
> such other fiduciary, knowing such act or
> omission is a breach; . . . if, by his failure
> to comply with section 1104(a)(1) . . . in the
> administration of his specific
> responsibilities which give rise to his status
> as a fiduciary, he has enabled such other
> fiduciary to commit a breach; or . . . if he
> has knowledge of a breach by such other
> fiduciary, unless he makes reasonable efforts
> under the circumstances to remedy the breach."

29 U.S.C. § 1105(a).  "[L]iability for participation in, concealment of, or failure to remedy a breach by a cofiduciary is contingent upon a finding that the fiduciary knew that the other individual was a fiduciary, that the cofiduciary participated in the act constituting the breach, and that the act constituted a breach."  *Brink v. DaLesio*, 496 F.Supp. 1350, 1383 (D.Md. 1980), *aff'd in part, rev'd in part*, 667 F.2d 420 (4th Cir. 1981), and *aff'd in part, rev'd in part and remanded*, (4th Cir. 1982).

Martone alleges that Barrett and Sandy Spring participated in each other's breaches of fiduciary duty.  It contends that Barrett and Sandy Spring: (1) "failed to follow Martone's instructions with respect to Plan assets;" (2) "failed to make trades within one business day;" (3) "failed to transfer the Defined Benefit

Plan assets to Schwab as requested;" and (4) "liquidated and transferred the 401(k) Plan Assets." (ECF No. 1 ¶ 78). Martone also alleges that "[a]ll of Martone's dealings were directly with [Barrett]. Martone never communicated directly with [Sandy Spring] or [Acorn], and relied upon [Barrett] notwithstanding how [Barrett] may have delegated these duties to the other NERT Defendants." (ECF No. 1 ¶ 34). Assuming the truth of these factual allegations and construing them favorably to Martone, they suffice to show that Barrett and Sandy Spring knew the other was a fiduciary, participated in the acts constituting the other's breaches, and that each engaged in acts that constituted a breach. Thus, Martone has plausibly alleged that Barrett and Sandy Spring are subject to co-fiduciary duty for their participation in the other's alleged breaches.[1]

While Sandy Spring does not address Martone's co-fiduciary liability claim, Barrett asserts that Martone has not stated a claim for co-fiduciary liability because Martone used "'and/or' formulaic pleading of the elements of a cause of action." (ECF No. 16-1, at 26). As Martone points out, however, "a pleading of elements (1), (2) 'or' (3) of [ERISA] would suffice to state a claim." (ECF No. 25, at 25). Thus, "there is no reason that

---

[1] Martone does not specifically allege that Acorn participated in another NERT Defendant's breach of fiduciary duty.

Martone cannot state a claim by alleging that elements (1), (2), 'and/or' (3) were met." (*Id.* at 25).

### C. ERISA Equitable Relief Claims

Martone seeks equitable relief under § 1132(a)(3) to "redress the NERT Defendants' violations of ERISA and of the terms of the Plans and to enforce the provisions of ERISA and the terms of the Plans." (ECF No. 1, at 18). Martone requests equitable relief including:

> an accounting, an order that NERT Defendants disgorge any ill-gotten gains or payments they received, equitable restitution, an equitable surcharge holding NERT Defendants liable for the loss to the Plans and for any profits the Plans would have accrued in the absence of such breach, and any other remedies to put Plaintiff in the position it would have attained but for the NERT Defendants' breaches.

(ECF No. 1, at 20).

ERISA authorizes plaintiffs to bring suit for equitable relief against defendants who are not fiduciaries. *See* 29 U.S.C. § 1132(a)(3); *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 247 (2000) ("[D]efendant status . . . does not turn on whether the defendant is expressly subject to a duty under one of ERISA's substantive provisions."). Martone seeks "remed[ies] traditionally viewed as equitable, such as injunction [and] restitution." *Mertens*, 508 U.S. at 255 (internal quotation marks omitted).

None of the NERT Defendants address Martone's equitable relief claim in their motions to dismiss.  In its reply, however, Barrett states that it "did not devote unique attention to Count II in the Motion because it appears to duplicate Count I."  (ECF No. 30, at 21).  A claim for equitable relief under § 1132(a)(3), however, is separate from a claim for breach of fiduciary duty under § 1132(a)(2).[2]   Also in its reply, Barrett argues that "[o]ther than breaches of fiduciary duty alleged in Count I, Martone makes no factual allegation concerning the transgression or enforcement of any term of ERISA or the Martone Plans."  (ECF No. 30, at 21-22).  Barrett is correct that § 1132(a)(3) "does not authorize appropriate equitable relief at large, but only appropriate equitable relief for the purpose of redress[ing any] violations or enforc[ing] any provisions of ERISA or an ERISA plan."  (ECF No. 30, at 21) (citing *Harris Trust*, 530 U.S. at 239) (internal quotation marks omitted).  Martone, however, has alleged that equitable relief would "redress the NERT Defendants' violations of ERISA and of the terms of the Plans and to enforce the provisions of ERISA and the terms of the Plans."  (ECF No. 1, at 18).  Thus, Barrett's arguments for dismissal of Count II fail.

---

[2] Whether or not NERT Defendants have admitted the point by failing to respond is irrelevant because the court finds that Martone has properly stated a claim for equitable relief.

### D. Group Pleading

Acorn contends that Martone improperly employs "group pleading" by "avoid[ing] making any specific reference to Acorn—distinct from the other Defendants—at all in the Complaint." (ECF No. 19-2, at 9).  To support the proposition that Martone "has not specifically alleged Acorn's involvement in any of the conduct purportedly giving rise to Martone's causes of action," Acorn cites *McPherson v. Baltimore Police Dep't*, 494 F.Supp.3d 269 (D.Md. 2020), in which the court determined that "[w]hile group pleading can be permissible in certain circumstances, it must be 'plausible that each defendant was involved in all of the facts as alleged.'" *McPherson*, 494 F.Supp.3d at 280 (quoting *Sprint Nextel Corp. v. Simple Cell, Inc.*, No. 13-cv-617-CCB, 2013 WL 3776933, at *2 (D.Md. July 17, 2013)).  Martone responds that the complaint included specific allegations against Acorn and its group pleading is proper because it "alleges that *all* of the NERT Defendants were responsible for charging and receiving investment fees." (ECF No. 27, at 10-12).

Here, Martone has alleged facts that make it plausible that Acorn "was involved in all of the acts as alleged." *Sprint Nextel*, 2013 WL 377693, at *2.  It is plausible that Acorn, together with the other NERT Defendants, was responsible for charging investment fees to the Plans without providing investment services.  Martone's inclusion of allegations that only address one particular

defendant helps establish that when it references all NERT Defendants, it is alleging that the NERT Defendants acted collectively. *See Burgess v. Baltimore Police Dep't*, No. 15-cv-834-RDB, 2016 WL 795975, at *10 (D.Md. Mar. 1, 2016). Consequently, Martone has not engaged in improper group pleading.

**E. Common Law Claims**

In Counts III, IV, and V of the complaint, Martone asserts claims for common law breach of fiduciary duty, unjust enrichment, and negligence respectively. (ECF No. 1, at 21-27). NERT Defendants argue that the common law counts are preempted by ERISA. (ECF Nos. 11-1, at 17; 16-1, at 22; 19-2, at 16).

ERISA's preemption provision provides, "the provisions of [ERISA] shall supersede any and all State laws insofar as they now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). ERISA's preemption is "deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.'" *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45-46 (1987) (quoting *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 523 (1981)). "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983). It is well settled that ERISA's preemptive scope is not limited to "state laws specifically designed to affect employee benefit plans." *Pilot Life*, 481 U.S.

29

at 47-48 (quoting *Shaw*, 463 U.S. at 98); *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004) ("[A]ny state-law cause of action that duplicates, supplements, or supplants ERISA's civil enforcement remedy . . . is pre-empted.").

Yet, ERISA's preemptive scope has limits. "Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw*, 463 U.S. at 100 n.21. Courts must look "to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Wilmington Shipping Co. v. New England Life Ins. Co.*, 496 F.3d 326, 342 (4th Cir. 2007). The Fourth Circuit explained,

> [c]onsidering ERISA's objectives set forth in 29 U.S.C.A. § 1001(b), the Supreme Court has explained that Congress intended ERISA to preempt at least three categories of state law: (1) laws that "mandate[ ] employee benefit structures or their administration"; (2) laws that bind employers or plan administrators to particular choices or preclude uniform administrative practice; and (3) "laws providing alternate enforcement mechanisms" for employees to obtain ERISA plan benefits. A key feature of these categories of laws is that they "implicate the relations among the traditional ERISA plan entities."

*Id.* (internal citations omitted). While "Congress intended to preempt 'state laws providing alternate mechanisms' for employees to obtain ERISA plan benefits," the Fourth Circuit has held that "Congress did *not* intend to preempt 'traditional state-based laws

30

of general applicability [that do not] implicate the relations among the traditional ERISA plan entities,' including the principals, the employer, the plan, the plan fiduciaries and the beneficiaries." *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1468-69 (4th Cir. 1996) (emphasis added) (citing *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995); *Sweeney,* 89 F.3d at 1167).

Barrett argues that the breach of fiduciary duty, unjust enrichment, and negligence state common law claims "would represent an enforcement mechanism alternative to ERISA," thus implicating the third *Wilmington* category of state law. (ECF No. 16-1, at 27).

### 1. Common Law Breach of Fiduciary Duty Claim

Martone asserts a common law breach of fiduciary claim "[i]n addition and in the alternative to its claims under ERISA[.]" (ECF No. 1 ¶ 93). It argues NERT Defendants owed a fiduciary duty to Martone and the Plans because they "did not deal on equal terms with Plaintiff," "occupied a position of special trust and confidence with respect to Plaintiff," and "exercised control and discretion over the funds in the Plans, including the investment thereof." (*Id.* at ¶ 94). Martone adds that "NERT Defendants had duties to Plaintiff to manage and invest the Plans' funds, at the direction of Plaintiff, reasonably and prudently with due care and in accordance with the Plans, contracts, and applicable law." (*Id.*

31

at ¶ 95).  Martone employs the same language as to why each NERT Defendant was a fiduciary and how each NERT Defendant breached their fiduciary duties as it did in its ERISA claim.  (*Id.* at ¶¶ 75, 78, 94, 96).

Like Martone's ERISA claims, its common law breach of fiduciary duty claim references NERT Defendants' failures to make trades within one business day, transfer the Plan assets to Schwab as instructed, allow the Plan to fully invest in the market, and follow Martone's instructions, as well as charging investment fees when no investment advisory services were provided, and liquidating and transferring the Plan assets without authorization.  (ECF No. 1, at ¶ 96).  Martone's common law breach of fiduciary duty claim is not based on any state laws of general applicability; rather, it implicates the relations among traditional ERISA plan entities including the Plan fiduciaries (allegedly Barrett, Sandy Spring, and Acorn) and beneficiaries. *See Coyne & Delany*, 98 F.3d at 1471.  It therefore would represent an alternative enforcement mechanism to ERISA.  In fact, Martone seems to admit that the parallels between the ERISA and state common law claims are deliberate.  It states it pled the common law claim breach of fiduciary duty claim "[i]n addition and in the alternative to its claims under ERISA[.]"  (ECF No. 1 ¶ 93).

Martone cites cases holding that it would be "premature to dismiss the common law claims based upon ERISA preemption at the

motion to dismiss stage." (ECF No. 25, at 26) (citing *England v. Marriott Int'l, Inc.*, 764 F.Supp.2d 761, 781 (D.Md. 2011); *Moore v. Life Ins. Co. of North Am.*, 278 F.App'x 238, 241-42 (4th Cir. 2008)). Martone's cases are distinguishable from the one at hand. In *England*, "the central dispute . . . [was] *whether* ERISA applie[d] to the Retirement Awards. Only if and when the Court decides that ERISA does apply to the Retirement Awards would dismissal of the breach of contract claims . . . be appropriate." 764 F.Supp.2d at 781. Here, however, NERT Defendants do not dispute that ERISA governs the Plans; rather, they argue that they are not fiduciaries under the Plans and if they are fiduciaries, that they did not breach their fiduciary duties. And in *Moore*, the plaintiff had "contended from the outset that her claims did not fall within ERISA, asserted the ERISA claim only in the alternative, and argued that the alternative count should not be considered an acknowledgment of the policy's status as an ERISA plan." 278 F.App'x at 240. Here, on the other hand, Martone's primary allegations arise under ERISA, not state law, and it is the state law claims that are pled in the alternative.

Courts regularly dismiss state law claims pled in the alternative to ERISA claims. *See, e.g., O'Brien v. Verizon Commc'ns*, No. 07-cv-501-DKC, 2008 WL 11509720, at *3 (D.Md. Feb. 21, 2008) ("Courts have found that such arguments in the alternative are 'precisely the kind of alternate enforcement

mechanism to obtain ERISA plan benefits that the Fourth Circuit deemed appropriate for preemption in *Coyne & Delany*.'") (citing *Wilmington*, 496 F.3d at 343 (upholding preemption where plaintiffs "candidly characterize their state-law claims as 'alternatives' to [defendant's] ERISA claim, a good tip off that they seek the kind of 'alternate enforcement mechanism[ ]' that ERISA preempts"); *Kress v. Food Emps. Lab. Rels. Ass'n*, 217 F.Supp.2d 682, 686 (D.Md. 2002) (preempting claim that "[i]n effect . . . is an insurance policy guarding against the failure of [plaintiff's] ERISA claims against the Fund")); *see also Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990) (determining that a state law cause of action should be preempted when a "court's [state law] inquiry must be directed to the plan" because the "judicially created cause of action relate[s] to an ERISA plan") (internal quotation marks omitted). Martone's state common law claim for breach of fiduciary duty relates to the employee benefit plan within the meaning of 29 U.S.C. § 1144(a). Accordingly, ERISA preempts it, and Count III will be dismissed.

### 2. Common Law Unjust Enrichment Claim

Martone argues that "Plaintiff is entitled to a money judgment against NERT Defendants because Plaintiff conferred the benefit of payment to NERT Defendants for services, which Defendants failed to perform." (ECF No. 1 ¶ 101). The alleged benefits include the "payment of certain fees for services including investment

34

advisory services, but [Barrett] and [Acorn] did not provide investment advice or perform any other such services for Plaintiff." (*Id.* ¶ 102). The alleged benefits also include Barrett's and Sandy Spring's

> obligation to follow Plaintiff's instructions to make trades on a timely basis by the following business day, transfer[ ] the Plan assets as instructed, allow[ ] access to a self-directed TD Ameritrade account, and otherwise communicat[e] with Plaintiff and follow[ ] Plaintiff's instructions with respect to the management of the Plan and Plan assets, but NERT Administrator and NERT Trustee did not perform these services.

(*Id.* ¶ 103). Finally, Martone alleges that it is inequitable for NERT Defendants to accept and retain such payments and benefits because "NERT Defendants did not perform the aforementioned services." (*Id.* ¶ 104). Thus, Martone has pled specific facts alleging that it is entitled to recover under an unjust enrichment theory.

Martone's unjust enrichment claim does not relate to the employee benefit plan within the meaning of 29 U.S.C. § 1144(a). While the ERISA claims allege that NERT Defendants were fiduciaries to the Plans and breached their fiduciary duties, the unjust enrichment claim alleges that Martone conferred a benefit upon NERT Defendants for services that NERT Defendants did not provide. (ECF No. 1 ¶¶ 102, 103). The unjust enrichment claim would not

represent an alternative enforcement mechanism to ERISA.  Thus, ERISA does not preempt Martone's unjust enrichment claim.

### 3. Common Law Negligence Claim

Martone asserts a common law negligence claim "[i]n addition and in the alternative to its claims under ERISA[.]"  (*Id.* ¶ 107). Martone alleges that NERT Defendants breached their duties "to hold, manage, and invest the Plans' assets with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the matter."  (*Id.* ¶ 108).

Like its common law breach of fiduciary duty claim, Martone's negligence claim repeats the same language as to what actions constitute a breach of duty as in its ERISA claim.  (*Id.* ¶¶ 78, 109).  Because the negligence claim would represent an alternative enforcement mechanism to ERISA, it is preempted by ERISA.

## IV.  Conclusion

For the foregoing reasons, NERT Defendants' motions to dismiss will be granted in part and denied in part.  A separate order will follow.

                                    /s/
                                    _____
                                    DEBORAH K. CHASANOW
                                    United States District Judge